## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

VFS LEASING CO.                    )
                                   )
    Plaintiff,                     )
                                   )          CIVIL ACTION NO.
vs.                                )          3:06cv638-SRW
                                   )
G.F. KELLY, INC. d/b/a KELLY       )
TRUCKING; and GUY KELLY,           )
                                   )
    Defendants                     )

### PLAINTIFF'S MOTION TO STRIKE

**COMES NOW** Plaintiff VFS Leasing Co. ("VFS" or "Plaintiff"), by and through

its undersigned counsel, and respectfully moves this Court to Strike the Affidavits of Charles

David Lance and Guy F. Kelly in their entirety, attached as Exhibits to Defendants' Response in

Opposition to Plaintiff's Motion for Summary Judgment. In support thereof, Plaintiff states as

follows:

### INTRODUCTION

This is a breach of contract case arising from Defendants' G.F. Kelly, Inc. ("Kelly

Trucking") and personal guarantor, Guy F. Kelly ("Kelly") default on a lease of commercial

tractors from VFS ("Leased Tractors"). On or about November 28, 2006, Plaintiff filed its

Motion for Summary Judgment in this matter. On or about February 13, 2007, Defendants filed

their Response in Opposition to Plaintiff's Motion for Summary Judgment. In conjunction with

their Response, Defendants submitted the Affidavits of Kelly, president of Kelly Trucking and

Charles David Lance ("Lance"), an employee of Kelly Trucking, wherein both Kelly and Lance

claim to be experts in the sale of commercial over-the-road trucks in the wholesale market and

opine on the manner in which Plaintiff repossessed and resold the Leased Tractors. Specifically,

1

Kelly claims Plaintiff charged Kelly Trucking excessive amounts for repossession expense, inspection fees and detailing fees. In addition, Kelly claims that Plaintiff did not resell the trucks following repossession in a "commercially reasonable manner." Lance claims that Plaintiff performed excessive and unnecessary repairs when reconditioning the trucks following repossession and further inflated the reconditioning costs.

Neither Kelly nor Lance are experts in the sale of used commercial tractors in the wholesale market after repossession. Neither has demonstrated expert knowledge by education, training, experience or otherwise that would establish them as experts in this field. Consequently, Kelly's and Lance's opinion testimony in their affidavits is nothing more than speculation and conjecture and both and incompetent. For these reasons, Plaintiff's Motion to Strike is due to be granted.

## ARGUMENT

Plaintiff moves to strike the purported "expert" opinions of Kelly and Lance in their entirety because both lack the qualifications, education or experience necessary to opine concerning the accepted industry practices regarding repossession, reconditioning and resale of repossessed commercial over-the-road tractors by finance companies, leasing companies and banks. The admissibility of expert testimony--whether based on "scientific," "technical," or "other specialized" knowledge--is governed by Fed. R. Evid. 702 and the principles announced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

See also McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004).

The Supreme Court in Daubert and more recently in Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), provided further guidance on the court's task under Fed. R. Evid. 702, emphasizing the district court's "gatekeeping" function to ensure that expert testimony, be it traditional scientific principles or other technical or specialized knowledge, is both reliable and relevant. Kumho, 526 U.S. at 141, 119 S. Ct. at 1171 and 1176. The fundamental purpose of this gatekeeping requirement "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152, 119 S.Ct. at 1176. See also Corwin v. Walt Disney Co. 475 F.3d 1239, 1250 (11th Cir. 2007) ("The court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand."). Indeed, the gatekeeping role is designed "to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." DePaepe v. General Motors, 141 F.3d 715, 720 (7th Cir. 1998). In other words, Defendants bear the burden of establishing that Kelly and Lance are qualified, that their opinions are relevant, and that their opinions are based upon reliable information. See, e.g., Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). Opinions that are based upon insufficient facts or data must be struck. See, e.g., Home Design Services, Inc. v. Hibiscus Homes of Florida Inc., 2005 WL 2465020, *6 (M.D. Fla. Oct. 6, 2005) (striking an expert's opinion as unreliable because it was based on insufficient facts and data.).

B JAC2 745148 v1
1039265-000044 4/30/2007

1.  **Plaintiff Complied With The Relevant Industry Standards Regarding The Repossession And Resale Of Used Heavy Trucking Equipment By Finance Companies, Leasing Companies And Banks.**

The tractors in question were reclaimed after a default under the terms of the lease agreement between Plaintiff and Kelly Trucking ("Lease Agreement"). Plaintiff then inspected, detailed and remarketed the tractors based on accepted national industry practices. See Declaration of Michael Cox, pgs. 5-6, ¶ 27, attached hereto as **Exhibit A**.

Plaintiff contracted with a national repossession company, Alternative Collection Solutions, Inc. ("ACS"), to reclaim the tractors from Kelly Trucking. See Declaration of Keith Weachter, pg. 1, ¶ 4, attached hereto as **Exhibit B**. ACS' services are utilized by a host of finance and leasing clients who are required to repossess over-the-road tractors due to their customers defaults. In general, ACS charges a flat, pre-approved standard rate to its clients for repossessions. Id. at pg. 1, ¶ 3. Included in this charge are the costs of coordinating the repossession, paying the local agents their fees for the actual repossession and the costs incurred to locate the tractors. Id. If the cost exceeds the flat fee, ACS does not charge extra. Charging a pre-approved flat fee per tractor is a generally accepted practice in the industry. Id. In 2005, ACS charged Plaintiff $1,000 repossession fee per tractor. This was a reasonable and competitive rate within the repossession industry and was, in fact, lower than the average rate. Id. However, because Plaintiff was contracting to have more than 10 tractors repossessed on this occasion, ACS charged Plaintiff an even lower rate -- $700/tractor. Id. at pg. 1, ¶ 4. As is the standard practice in the industry, and in accord with the terms and conditions of the contract, Plaintiff deducted these charges from the sales price of each tractor at Plaintiff's cost.

As is a standard accepted practice in the industry, Plaintiff also had the Leased Tractors inspected. See **Exhibit A**, pg. 4, ¶ 21. Plaintiff incurred a $300 charge for each inspection. The

amount of this charge was a reasonable and competitive rate in the industry and in the mid-range of what other customers were being charged for inspections during the same time period. Id. The Leased Tractors were also detailed as necessary to prepare them for resale. Plaintiff was charged a $500.00 fee for each truck that received the standard detailing. Detailing a repossessed tractor is an accepted practice in the industry. Id. at pg. 5, ¶ 27. The fee Plaintiff was charged, which was passed on at cost to Defendants was reasonable and competitive in the marketplace at the time. Id. at pg. 3, ¶ 16.

After repossession, inspection and detailing, Plaintiff remarketed and sold the tractors at auction. The method that Plaintiff utilized to sell the tractors was an accepted industry practice for selling repossessed over-the-road tractors. Id. at pgs. 2-3, ¶¶ 9-14. In addition to the method chosen by Plaintiff, other acceptable methods of selling the equipment were available, though not preferred to the method chosen by Plaintiff. Id. at pg. 3, ¶ 15. Plaintiff chose the accepted practice of marketing the Leased Tractors to the relevant marketplace and consigning them in a reserve auction. Specifically, this was done at the Adessa Heavy Truck Sale in Atlanta, Georgia, one of the largest fixed location auctions in the U.S. Id. at pg. 3, ¶ 11. The sale prices that Plaintiff received for the Lease Tractors was consistent with the market values for similar tractors under the then existing market conditions. Id. The method and manner of sale were in accordance with accepted industry practices. Id. at pg. 5, ¶ 27.

### 2. Kelly Is Not An Expert Regarding the Relevant Industry Standards And His Affidavit Is Due To Be Struck In Its Entirety.

Kelly's testimony and affidavit does not include any definitive knowledge of the Equipment Finance industry or the resale of repossessed equipment. Id. at pg. 5, ¶ 25. Kelly lacks direct, expert knowledge of either the wholesale or retail equipment sales market. Id.

B JAC2 745148 v1
1039265-000044 4/30/2007

Moreover, he lacks any knowledge of auction theory or vehicle remarketing. Id. His affidavit does not purport to qualify Kelly in any manner as someone with expertise regarding auction theory or heavy trucking equipment remarketing. Kelly has demonstrated no specialized or expert knowledge of the accepted sales practices for the remarketing of used over-the-road tractors in the wholesale market. Thus, Kelly is not qualified to give his expert opinion in this matter.

Kelly readily admits in his deposition testimony that the majority of his experience with the sale of used trucking equipment derives solely from his time at Kelly Trucking. See Kelly Depo., pgs. 18:14 – 19:2, attached hereto as **Exhibit C**. Moreover, Kelly's experience selling used tractors at auction is limited to the last six months in which he sold approximately five tractors through a single auction in Newnan, Georgia. Id. at pg. 20:5-9. He has never purchased a tractor at auction. Id. at pg. 26:9-12. He has no demonstrated knowledge of the subject of auctions or auction theory or what is an accepted practice in the industry for the resale of repossessed over-the-road tractors. He simply has failed to demonstrate that he is an expert.

In addition to his allegations that Plaintiff mishandled the resale of the repossessed tractors, it is Kelly's alleged "expert" opinion that Plaintiff charged excessive fees when it repossessed the specific trucks at issue in this matter. However, Kelly admits in his deposition that his repossession experience is limited to one occasion within the last month in which he had to repossess a truck from one of his own drivers. Id. at pg. 55:5-16. Importantly, Kelly has never hired a repossession company and does not even know the standard charges utilized by repossession companies for repossessing trucks. Id. at pg. 55:17-22. Moreover, Kelly admits that he knows nothing about the company who repossessed the trucks:

Q: Do you know who the company was that handled the turn-in or repossession of the tractors?

6

A: No.

Q: Do you know what they base their charges on?

A: No.

Q: Do you know whether they charge other customers that they have a same or similar fee?

A: No.

Q: Are you aware of any other repossession companies in this same line of work as the company that did this one?

A: No.

Q: Obviously, then, you don't know what they charge either?

A: No.

Id. at pgs. 63:11 – 64:6.  Instead, Kelly bases his purported "expert opinion" entirely on the mileage that Kelly Trucking would have had to pay a driver to drive to the Plaintiff's location. Id. at pgs. 54:19 – 55:4.  The basis for his opinion is insufficient to qualify him as an expert.

Kelly also disputes the inspection fees that Plaintiff charged after repossession. However, Kelly again admits that he has no idea what an inspection company bases its fees on:

Q: Do you know what company did the inspection on the Volvo tractors?

A: No.

Q: Do you know what they base their $300 charge on?

A: No.

Q: Do you know what they charge their other customers?

A: No.

Q: Do you know of any other companies in the industry that do inspections in connection with repossessions and sales?

A: No.

Q: What is your knowledge of what a reasonable inspection fee is in the industry based upon?

7

\*\*\*\*

A: No documented knowledge.

Q: What experience do you have with inspection fees in connection with repossession and sales?

A: None with actual repossession.

Id. at pgs. 65:4 – 66:5.

And in the same manner, Kelly has little to no experience with the detailing of trucks being sold at auction. In fact, Kelly's only detailing exposure comes from an outside service who washes his trucks:

Q: What all is involved in detailing?

A: When we detail a truck, it's basically a complete cleaning of the inside and outside.

Q: Okay. Do you know who detailed these Volvo trucks for Volvo?

A: No.

Q: Have you used any outside vendors to detail your tractors?

A: I use an outside service to, you know, wash and clean my trucks, correct.

Q: Does that include cleaning the interior?

A: No.

\*\*\*\*

Q: Do you know what all was involved in the detailing that was done on these eight trucks?

A: No.

Q: You don't?

A: No.

Id. at pgs. 72:17 – 74:17.

In summary, Kelly's affidavit and deposition testimony fail to offer any foundation for his alleged industry "expertise" in the repossession, inspection, detailing and sale of over-the-road tractors by finance companies, leasing companies or banks after repossession. Kelly is simply not an expert.  For this reason, Kelly's affidavit and testimony are due to be stricken it its entirety.

### 3. Lance Is Not An Expert In The Relevant Areas And His Affidavit Is Due To Be Struck In Its Entirety.

Much like Kelly, Lance's experience with the reconditioning of used heavy trucking equipment is limited to performing repairs inside a locally owned and controlled trucking company.  See **Exhibit A**, pg. 5, ¶ 26.  He has no knowledge of what is accepted in the industry. Id.

Lance's purported "expert" opinion alleges that the estimates for reconditioning given to Plaintiff by its contractors were excessive and unnecessary.  However, Lance readily admits in his deposition, that he based his opinions exclusively on the rates that would by charged by Kelly Trucking:

Q:  Now, there are some handwritten notes out to the side.  What does that mean?

A:  That was what I figured I could do the work for.

Q:  Those are your notes?

A:  Yes, sir.

Q:  And that's what you figured you could do that work for –

A:  Yes, sir.

Q:  -- based upon your rates at Kelly Trucking?

A:  Yes, sir.

Q:  All right.  In 2005?

A: Yes, sir.

Q: So that would be $50 an hour –

A: Yes, sir.

Q: -- and whatever Kelly Trucking could buy the parts for?

A: Yes, sir.

<u>See</u> Charles David Lance Depo., pgs. 22:14 – 23:11, attached hereto as **Exhibit D**.

In fact, Lance admits that his opinion is <u>not</u> <u>based</u> <u>on</u> <u>knowledge</u> <u>of</u> <u>what</u> <u>is</u> <u>acceptable</u> <u>in</u> <u>the</u> <u>industry</u> but is, in fact, only based on his limited experience working at Kelly Trucking in Wadley, Alabama:

Q: Okay. Just so I'm clear, I want to make sure you and I are on the same page, looking at paragraph 5 of your affidavit, the last sentence says, the repairs shown on these appraisal reports would result in the trucks being in more than wholesale condition, which is not keeping with the standard. Are those the appraisal reports that you are talking about?

A: Yes, sir.

Q: What is the standard that you are referring to?

A: Explain.

Q: That's what I'm asking you to do.

A: Okay.

Q: You make reference to a standard in paragraph 5.

A: I guess it would be repaired to what we would do it for if we had it at the shop. I mean, we would bring it in and if it needed, you know, a crack fixed here or a fender fixed there, then we would do that necessary repair to our standards.

Q: To Kelly Trucking standards?

A: Right.

Q: In paragraph 6 you say, I have evaluated the cost of these repairs based upon knowledge and experience, and have determined the actual cost of the same repairs. Attached is the chart comparing the reconditioning expense contained in the appraisal report with my opinion of the actual cost of these repairs.

10

A: Yes, sir.

Q: When you say based upon your experience and knowledge, are you talking about what would have been done at Kelly Trucking?

A: Yes, sir.

Id. at pgs. 39:20 – 41:17.

Much like Kelly's testimony, Lance's affidavit and deposition testimony fail to offer any foundation for his alleged industry "expertise" in the reconditioning of used trucking equipment or what finance companies, leasing companies or banks are charged for this service after repossession. He does not even pretend to base his opinion on any knowledge of what the industry finds acceptable. Rather, he clearly admits that the only practice he knows about is what is done at Kelly Trucking in Wadley, Alabama. Lance has not demonstrable knowledge of what is acceptable in the industry. Thus, his affidavit and testimony is due to be stricken in its entirety.

## CONCLUSION

The affidavits of both Guy F. Kelly and Charles David Lance are unreliable and are due to be stricken in their entirety. The opinions offered therein are nothing more than rank speculation and conjecture and are wholly unsubstantiated. Based on the principles set forth in Daubert and Kumho Tire, this Court cannot admit conclusions based on data with the aforementioned deficiencies and should, therefore, grant Plaintiff's Motion to Strike.

Respectfully submitted this 30th day of April, 2007.

s/ David B. Hall
DAVID B. HALL (HAL052)
JULIE A. COTTINGHAM (COT017)
Attorneys for Plaintiff VFS Leasing Co.

B JAC2 745148 v1
1039265-000044 4/30/2007

OF COUNSEL:

BAKER DONELSON, BEARMAN
  CALDWELL & BERKOWITZ
A Professional Corporation
420 North 20th Street
Suite 1600 Wachovia Tower
Birmingham, Alabama 35203-5202
(205) 328-0480

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 30th day of April, 2007, the foregoing has been electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing, to the following counsel of record:

James H. Starnes
Attorney for Defendants
PO Box 590003
Birmingham, AL 35259
(205) 320-0800

S. Sanford Holliday
Attorney for Defendants
PO Box 727
Roanoke, AL 36274
(334) 863-2717

s/  David B. Hall
**OF COUNSEL**

B JAC2 745148 v1
1039265-000044 4/30/2007

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

| | |
|---|---|
| VFS LEASING CO. | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO. |
| vs. | ) 3:06cv638-SRW |
| | ) |
| G.F. KELLY, INC. d/b/a KELLY | ) |
| TRUCKING; and GUY KELLY, | ) |
| | ) |
| Defendants | ) |

## DECLARATION OF MICHAEL COX

1.      My name is Michael Cox. The statements contained herein are based on my personal knowledge, and I am competent to testify about all matters on which I am offering evidence herein.

### I. Information Reviewed and Qualifications

2.      The opinions derived herein are made up of a review of the information made available to me in regards to this case, and my personal knowledge of the heavy transportation equipment industry. I have been involved with the transportation industry since 1991, specializing in medium/heavy trucks and trailers.

### A. Information Reviewed

3.      The information I have reviewed to form my opinions on this matter includes:

- Affidavit of Guy F. Kelly ,
- Deposition of Kevin Miller, VFS Leasing Co., employee And all documents contained therein
- Inspection Reports completed by Asset Appraisal Services
- Affidavit of Charles David Lance
- Deposition of Guy F. Kelly
- Deposition of Charles Davis Lance
- Asset Appraisal Services Internal database of auction sales results

### B. Expert Experience

4.      Resume attached as Exhibit A

### C. Published Works

*VFS Leasing Co. v. G.F. Kelly, d/b/a Kelly Trucking*
*et al. v. (N10152)*
*Declaration of M. Cox - page*

5.    I have had no published papers in the last 10 years.

## D. Courtroom and Deposition Testimony

6.    List attached as Exhibit B

## E. Expert Witness Charges

7.    Asset Appraisal Services charges $100 per hour for testimony plus expenses, and $100 per hour for research and documentation fees.

## II. Opinions

8.    On behalf of Baker, Donaldson, Bearman Caldwell & Berkowitz, P.C. I have been asked to provide an expert opinion for six issues:

- Did VFS Leasing Co. act in a commercially reasonable manner when they liquidated units leased by the defendant; specifically units: (last three of VIN) 013, 014, 015, 016, 017, 018, 019, 020, 021, 738, 739, 763, 764, 762, 584, 989, 958, 954, 953, 952, 959.
- Were the charges accrued to the defendant's account for Reconditioning services, specifically the detailing charged to several of the units reasonable for the market?
- Were the charges accrued to the defendant's account for Repossession expenses reasonable for the market?
- Were the charges accrued to the defendant's accounts for Inspection services reasonable for the market?
- Is Guy F. Kelly qualified to be an expert witness on any or all of these issues?
- Is Charles Davis Lance qualified to be an expert witness on any or all of these issues?

## A. VFS Liquidation

9.    It is my experience, observing Volvo Commercial Finance and VFS Leasing Co. for over six years, that its practices in this area are commercially reasonable.

10.    It is my opinion that VFS Leasing Co. acted in a commercially reasonable manner in the selling of each of the units at issue for the following reasons:

- VFS Leasing Co. marketed these units to the marketplace that would be interested in purchasing this equipment.
- VFS Leasing Co. insured redundancy in their sales process by consigning the units in a reserved auction at the Adessa Heavy Truck Sale in Atlanta, GA, one of the largest fixed location auctions in the United States
- The prices that VFS Leasing Co. received for the units are consistent with the market values for similar units under the market conditions present during the time frame: October 2005 to January 2006.

*VFS Leasing Co. v. G F. Kelly d.b.a. Kelly Trucking*

11. VFS Leasing Co. used their standard sales process to make these units available for sale. This process included:

- The units were sent to Adessa in Atlanta, GA for storage and reconditioning. During this time the units were consigned to a reserved price public auction. They did not meet the reserve and did not sell.
- The units were listed on the limited access wholesale website open to qualified wholesale buyers who wish to purchase equipment from VFS Leasing Co. During the time of listing, the national wholesale equipment community was actively utilizing this site.
- The equipment was listed and marketed by VFS Leasing Co. for sale to the buyer who places the highest offer on the web site during a set period of time. VFS Leasing Co. received multiple bids and sold the units to the highest bidder for fair market value.

12. The method that VFS Leasing Co. utilized to sell the said equipment is consistent with acceptable industry practices.

13. The prices VFS Leasing Co. received for the units were at or above fair market value for similar equipment in specification and condition.

14. The method VFS Leasing Co. used is not unique and is considered an acceptable industry practice for disposing of equipment. VFS Leasing Co. would have employed this method no matter the situation with the equipment, whether that equipment was off-lease and owned by Volvo, a repossessed unit or a lease default similar to the Kelly units.

15. VFS Leasing Co. could have pursued other sales avenues or methods accepted in the industry, but doing so would have meant marketing the equipment for a longer period of time, at additional cost thus decreasing the overall value of sale.

## B. Opinion of Reconditioning Fees

16. Volvo was charged $500.00 for a standard detail on select units. Based on my knowledge of the Used Truck marketplace and my experience in the industry; $500.00 is a reasonable fee to pay to detail a tractor such as those in question.

## C. Opinion of Repossession Fees

17. Volvo was charged $700.00 per unit for each unit repossessed from G.F. Kelly. Based on my experience in the industry and based on my experience working directly with Banks and Finance Companies for over seven years; $700.00 is not an unreasonable fee for this service as it was described in Mr. Miller's deposition.

## D. Inspection Services

*VFS Leasing Co. v. G.F. Kelly d/b/a Kelly Trucking*

18.     Asset Appraisal services has been in business since 1999. We provide inspections and aid in remarketing for heavy transportation equipment. Since 1999 we have inspected over 40,000 pieces of heavy transportation equipment. We provide our services to VFS Leasing Co.

19.     Our customer list includes many of VFS Leasing Co.'s peers:

| | |
|---|---|
| DaimlerChrysler Truck Financial | PACCAR Financial |
| Navistar Financial | Wells Fargo Eq Finance |
| US Bank Eq Finance | Bank of America |

20.     We provide services for these customers ranging from inspections to complete liquidation solutions.

21.     We charge VFS Leasing Co. $300.00 for each inspection. This cost is in line with what we charge other customers for similar services. We charge between $200.00 and $400.00 per similar inspection for all of our customers. The price is directly related to the amount of units we do for each individual customer. Asset Appraisal does have market competition and their charges are competitive in the marketplace.

22.     Asset Appraisal Services utilizes a standard method for completing all of our appraisals and condition reports:

*   The unit is assigned to us by the finance company or owner
*   We assign one of our inspectors to do the inspection.
*   When the inspection is complete it is sent to our Omaha facility where it is inputted into one of our proprietary software systems that we us to communicate the information to our customer.
*   After the unit goes through data entry, our Quality Control Staff looks the inspection over for errors. They price each reconditioning item using industry standard pricing for parts and job time.
*   After Quality Control has signed off on the unit, a communication is sent to the customer to notify them that the unit is ready for viewing.

23.     Our quality control staff has a combined thirty years of working on trucks and trailers and running shops. They are in regular contact with service centers around the country and all of the original equipment manufacturers.

24.     The prices that we list for reconditioning are meant to be used as a guideline. Each reconditioning item is normally photographed. Publishing the prices with the photographs allows our customers to fairly represent the units to prospective buyers.

## E.     Guy F. Kelly as an Expert Witness

*VFS Leasing Co. v. G.F. Kelly d/b/a Kelly Trucking*

H JAC2 745304 v1
103926S-000044 4/27/2007

25. Mr. Kelly is listed as an expert witness for G.F. Kelly. Mr. Kelly's testimony does not include any definitive knowledge of the Equipment Finance Industry. He demonstrates no direct knowledge of either the wholesale or retail equipment sales market. He is deficient of any knowledge of auction theory or any knowledge of vehicle remarketing as it pertains to finance companies. It is my opinion that Mr. Kelly lacks sufficient experience, knowledge or education to render an expert opinion on the commercially reasonableness of the sale of these tractors in any respect.

## F.    Charles Davis Lance as an Expert Witness

26. Mr. Lance is listed as an expert witness for G.F. Kelly. Mr. Lance said several times during his deposition on 12 April 2007 that his experience was limited to doing repairs inside a locally owned and controlled trucking company. Mr. Lance does not have experience working for a finance company. He does not have experience selling equipment in either a wholesale or a retail environment. He does not have experience making repair decisions on repossessed heavy transportation equipment. It is my opinion that Mr. Lance lacks the education, training, knowledge and/or experience to render an expert opinion on any aspect of the commercially reasonableness of the sale of these tractors.

## III. Conclusion

27. I was asked to form an expert opinion on six issues:

*   Did VFS Leasing Co. act in a commercially reasonable manner when they liquidated units leased by the defendant; specifically units : (last three of VIN) 013, 014, 015, 016, 017, 018, 019, 020, 021, 738, 739, 763, 764, 762, 584, 989, 958, 954, 953, 952, 959.

    **Opinion: VFS Leasing Co. sold the collateral in question in a commercially reasonable manner that is consistent with industry standards and best practices.**

*   Are the charges accrued to the defendant's account for Reconditioning services, specifically the detailing charged to several of the units reasonable in the market?

    **Opinion: The reconditioning fees are reasonable and were consistent with charges for similar actions in the market.**

*   Are the charges accrued to the defendant's account for repossession expenses reasonable in the market?

    **Opinion: The repossession fees are reasonable and were consistent with fees for similar actions in the market.**

- Are the charges accrued to the defendant's accounts for Inspection services reasonable in the market?

  **Opinion: The fees for inspection services were reasonable for charges for similar services in the market.**

- Is Guy F. Kelly qualified to render an expert opinion on the commercial reasonableness of the sale of these tractors?

  **Opinion: Guy F. Kelly is not qualified to render an expert opinion on the commercial reasonableness of the sale of these tractors.**

- Is Charles Davis Lance qualified to render an expert opinion on the commercial reasonableness of the sale of these tractors?

  **Opinion: Charles David Lance is not qualified to render an expert opinion on the commercial reasonableness of the sale of these tractors.**

I declare under penalty of perjury that the foregoing is true and correct.

27 April 2007

Date

Michael J. Cox
President
Asset Appraisal Services, Inc.
5710 South 77th Street
Ralston, Nebraska 68127

# Michael J. Cox

Asset Appraisal Services
5710 South 77th St ♦ Ralston, Nebraska 68127
Phone: 402-390-0505 ♦ Fax: 402-390-0489

## *Experience*

**Asset Appraisal Services Inc.**                                        Omaha, Nebraska
President                                                          January 1999 to Present

### *Job Responsibilities*

- Complete detailed appraisals and valuations of transportation and construction equipment.
- Consultation of clients on equipment dispersal and liquidation.
- Manage day to day operations of business.

**Midwest Truck and Bus Sales Inc.**                                 Omaha, Nebraska
President                                                    October 1998 to December 1999

### *Job Responsibilities*

- Manage day-to-day operation of an independent used truck dealership.
- Buying transportation equipment at wholesale prices and reselling equipment to retail buyers.
- Responsible for all areas of dealership, including accounting, sales, marketing, and parts and service.

**CornhuskerTrux**                                                   Omaha, Nebraska
Used Truck Manager                                          July 1997 to October 1998

### *Job Responsibilities*

- Managed used truck operations for Navistar franchised new and used truck dealership.
- Responsible for placing valuations on stock and future trades.
- Responsible for all reconditioning on trades and used truck purchases.

**Nebraska Used Truck Sales**                                       Omaha, Nebraska
Used Truck Sales                                              June 1995 to July 1997

### *Job Responsibilities*

- Used truck wholesale and retail sales.
- Responsible for wholesale purchasing of used transportation equipment.

**Midlands International Trucks**                                    Omaha, Nebraska

New and Used Truck Sales                                       May 1991 to June 1995
*Job Responsibilities*
- Prospecting new and used truck buyers.
- Sales of new International Trucks to fleets and owner operators.

Professional Groups:  Equipment Leasing Organization   Used Truck Association

Michael J. Cox

Asset Appraisal Services
5710 South 77th St ♦ Ralston, Nebraska
68127
Phone: 402-390-0505 ♦ Fax: 402-390-0489

*Experience*

**Asset Appraisal Services Inc.**                    Omaha, Nebraska
President                                    January 1999 to Present

*Job Responsibilities*
- Complete detailed appraisals and valuations of transportation and construction equipment.
- Consultation of clients on equipment dispersal and liquidation.
- Manage day to day operations of business.

**Midwest Truck and Bus Sales Inc.**                Omaha, Nebraska
President                            October 1998 to December 1999

*Job Responsibilities*
- Manage day-to-day operation of an independent used truck dealership.
- Buying transportation equipment at wholesale prices and reselling equipment to retail buyers.
- Responsible for all areas of dealership, including accounting, sales, marketing, and parts and service.

**CornhuskerTrux**                            Omaha, Nebraska
Used Truck Manager                        July 1997 to October 1998

*Job Responsibilities*
- Managed used truck operations for Navistar franchised new and used truck dealership.
- Responsible for placing valuations on stock and future trades.
- Responsible for all reconditioning on trades and used truck purchases.

**Nebraska Used Truck Sales**                    Omaha, Nebraska
Used Truck Sales                            June 1995 to July 1997

*Job Responsibilities*
- Used truck wholesale and retail sales.
- Responsible for wholesale purchasing of used transportation equipment.

*Midlands International Trucks*                    ***Omaha, Nebraska***
***New and Used Truck Sales***                    ***May 1991 to June 1995***

*Job Responsibilities*
- Prospecting new and used truck buyers.
- Sales of new International Trucks to fleets and owner operators.

**Professional Groups**

*Equipment Leasing Organization*

***Used Truck Association***

**Rule 26(a) Disclosure**

This expert witness expects to be compensated as follows:  $1000.00 per day, plus travel expenses, and $100.00 per hour for documentation.

This expert has testified in the following actions:

Ronnie Dowdy Trucking (Little Rock, AR):
Case: 1:02-BK-14313                        Date 7/31/02

Jordan Carriers (Jackson, MS):
Case:  BK 01-01140 Chapter 11              Date 6/6/02

Dick Simon  (Salt Lake City, UT)
Case:  BK 02-22906GEC                      Date: 2/10/03

Greg Derry (Omaha, NE)                     Date:  12/18/00
Case:  Douglas County District Court Page 978 Page 893

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION**

| | | |
|---|---|---|
| VFS LEASING CO. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| vs. | ) | 3:06cv638-SRW |
| | ) | |
| G.F. KELLY, INC. d/b/a KELLY | ) | |
| TRUCKING; and GUY KELLY, | ) | |
| | ) | |
| Defendants | ) | |

## DECLARATION OF KEITH WEACHTER

1.    My name is Keith Weachter. The statements contained herein are based on my personal knowledge, and I am competent to testify about all matters on which I am offering evidence herein.

2.    I am the Repossession Coordinator for Alternative Collection Solutions, Inc. ("ACS"). I have held this position for four (4) years. As part of my responsibilities, I am in charge of locating equipment in need of repossession, hiring agents to handle the repossession and coordinating delivery of the equipment once it has been repossessed. I am familiar with the standard rates for repossession for ACS as well as our competitors in the same industry. The average repossession fee in the heavy trucking equipment industry is $1200 - $1500 per unit.

3.    ACS charges a standard rate of $1,000/unit. This fee includes the coordinator fee, the agent fees and the costs generated to locate the unit. This charge is a reasonable and competitive rate within the repossession industry. Generally, when our client needs more than ten (10) units repossessed, we offer the client a discount per unit.

3.    In or about August, 2005, I coordinated the repossession of twenty-one (21) tractors from G.F. Kelly, Inc. ("Kelly Trucking") for VFS Leasing Co. ("VFS"). Because VFS needed more than ten (10) units repossessed, we charged a discounted rate for the repossession of $700/unit.

4.    Based on my knowledge of the repossession industry and of the rates of ACS's competitors, the $700.00 fee that VFS charged back to Kelly Trucking for repossession of each of the twenty-one (21) tractors was a competitive and reasonable fee.

I declare under penalty of perjury that the foregoing is true and correct.

_4-27-07_
Date

Keith Weachter
Repossession Coordinator
Alternative Collection Solutions, Inc.

B JAC2 745239 v1
1039265-000044 4/27/2007

# EXHIBIT C

# FREEDOM COURT REPORTING

Page 1

1        IN THE UNITED STATES

2        DISTRICT COURT FOR THE

3      MIDDLE DISTRICT OF ALABAMA

4

5                              **ORIGINAL**

6   CIVIL ACTION NUMBER:  3:06CV638-SRW

7

8   VFS LEASING CO.,

9           Plaintiff,

10  vs.

11  G.F. KELLY, INC., d/b/a KELLY TRUCKING;

12  and GUY KELLY,

13          Defendants.

14

15

16        DEPOSITION TESTIMONY OF

17            GUY F. KELLY

18

19  April 12, 2007

20  10:45 a.m.

21

22  COURT REPORTER:

23  MELANIE L. PETIX, CSR, CLR

## FREEDOM COURT REPORTING

Page 18

1    Trucking?

2         A.    No.

3         Q.    On what other occasions have

4    you had an opportunity to sell

5    tractors?

6         A.    I have done one in the last

7    six months.

8         Q.    Okay.  That was with K-Diesel?

9         A.    Correct.

10        Q.    You worked at several trucking

11   companies before you started, I'm going

12   to call it, Kelly Trucking.

13        A.    Correct.

14        Q.    At any of those jobs, was it

15   ever your job responsibility to sell

16   tractors after the company decided not

17   to use them anymore?

18        A.    No.

19        Q.    Was anybody at Kelly Trucking

20   or anyone employed with Kelly Trucking

21   whose responsibility it was to sell

22   Kelly Trucking equipment after Kelly

23   Trucking decided it was not going to

## FREEDOM COURT REPORTING

Page 19

1    use it anymore?

2        A.    That was my responsibility.

3        Q.    Okay.  At any time, did you

4    sell any tractors to any dealers?

5        A.    Yes.

6        Q.    When was that?

7        A.    I know it's within the last

8    year's time frame, David.  I don't know

9    the exact date.

10        Q.    Which dealer did you sell it

11   to?

12        A.    Gulf Coast Mack, Montgomery.

13        Q.    How many tractors did you sell

14   to them?

15        A.    I think two.  I'm not

16   positive.  I know one for sure.  It may

17   have been two.  I'm not sure.

18        Q.    One or two?

19        A.    Yeah, one or two.  Yeah.

20        Q.    And I apologize if you have

21   said this.  I don't remember the time

22   frame you told me when you did this.

23        A.    It's been within the last

## FREEDOM COURT REPORTING

Page 20

1    year.

2        Q.    This would have been with

3    K-Diesel?

4        A.    Correct.

5        Q.    Have you ever sold any

6    tractors at auction?

7        A.    Yes.

8        Q.    When?

9        A.    Within the last six months.

10       Q.    Tell me the circumstances of

11   the auction sale.

12       A.    It was the R.B. Auction,

13   Newnan, Georgia.

14       Q.    N-e-u, is that how you spell

15   Newnan?

16       A.    N-e-w-n-a-n.

17       Q.    These are tractors that were

18   owned by you or one of the companies

19   that you own?

20       A.    Correct.  And they were paid

21   off.

22       Q.    They were paid off?  Why did

23   you sell them through an auction?

# FREEDOM COURT REPORTING

1    most of the repairs?

2        A.    Correct.

3        Q.    Would he be more knowledgeable

4    about the repairs that were actually

5    done on these tractors than you?

6        A.    Correct.

7        Q.    Are you -- well, I will get to

8    that.

9            Have you ever purchased any

10   tractors at auction, any type of

11   auction?

12       A.    Not tractors, no.

13           MR. STARNES:  Off the record.

14

15       (Discussion off the record.)

16

17       Q.    (BY MR. HALL:)  Do you

18   remember these tractors by unit number?

19           MR. STARNES:  Kelly truck

20   number is what he's talking about.

21           THE WITNESS:  Correct.

22           MR. STARNES:  I've got a sheet

23   that might help y'all with that, if I

# FREEDOM COURT REPORTING

Page 54

1      A.    Correct.

2      Q.    And I think in here, you give

3 an opinion as to what the charge should

4 have been.  Do you remember what it

5 was?

6           MR. STARNES:  You can look at

7 the affidavit.  It's in your affidavit.

8 Do you still have your affidavit in

9 front of you?

10          THE WITNESS:  You have it, you

11 took it.

12          MR. STARNES:  I believe it's

13 in paragraph 6, down at the bottom of

14 the first page and over on to number 2.

15          THE WITNESS:  They charged 700

16 in repo fees; is that correct?

17          MR. HALL:  Correct.

18          THE WITNESS:  Okay.

19      Q.    (BY MR. HALL:)  What was your

20 opinion of what should have been

21 charged?

22      A.    Maximum cost, $200 per truck.

23      Q.    All right.  What do you base

## FREEDOM COURT REPORTING

Page 55

1    that on?

2        A.    The mileage that I would have

3    had to pay a driver to deliver the

4    trucks to their location.

5        Q.    Have you ever been in the

6    repossession business?

7        A.    Yeah.  Yes.

8        Q.    When was that?

9        A.    I had to -- I had to repo a

10   truck within the last month.

11       Q.    From whom?

12       A.    From a driver that I had

13   financed the truck.

14       Q.    Did you repossess that

15   yourself?

16       A.    Correct.

17       Q.    Have you ever had to hire a

18   repossession company?

19       A.    No.

20       Q.    Do you know what a standard

21   charge from a repossession company is?

22       A.    No.

23       Q.    I will show you what has been

# FREEDOM COURT REPORTING

Page 63

1    reconditioning costs.

2        Q.   And you don't know which of

3    these tractors on this list necessarily

4    matches up with which?

5        A.   I couldn't, David, no, not

6    just looking at them.

7        Q.   Do you know how many tractors

8    were repossessed off of this list,

9    Plaintiff's Exhibit 10?

10       A.   No.

11       Q.   Do you know who the company

12   was that handled the turn-in or

13   repossession of the tractors?

14       A.   No.

15       Q.   Do you know what they base

16   their charges on?

17       A.   No.

18       Q.   Do you know whether they

19   charge other customers that they have a

20   same or similar fee?

21       A.   No.

22       Q.   Are you aware of any other

23   repossession companies in this same

# FREEDOM COURT REPORTING

Page 64

1    line of work as the company that did

2    this one?

3         A.    No.

4         Q.    Obviously, then, you don't

5    know what they charge either?

6         A.    No.

7         Q.    I asked about a detailing fee

8    and I think I was thinking of an

9    inspection fee.  I thought I did or

10   maybe I didn't.

11        A.    No.  You asked me about --

12        Q.    I did ask about detailing,

13   didn't I?

14        A.    No.  You asked me about a

15   repossession fee.

16        Q.    Yeah.  Do you know whether any

17   of these other companies:  Navistar,

18   Daimler/Chrysler, Omni Bank, G.E.

19   Finance, First Continental Leasing, and

20   Wells Fargo charged you an inspection

21   fee in connection with repossessing the

22   equipment?

23        A.    No.

## FREEDOM COURT REPORTING

Page 65

1    Q.    Same answer, you didn't

2    receive any information to that effect?

3    A.    Correct.

4    Q.    Do you know what company did

5    the inspection on the Volvo tractors?

6    A.    No.

7    Q.    Do you know what they base

8    their $300 charge on?

9    A.    No.

10   Q.    Do you know what they charge

11   their other customers?

12   A.    No.

13   Q.    Do you know of any other

14   companies in the industry that do

15   inspections in connection with

16   repossessions and sales?

17   A.    No.

18   Q.    What is your knowledge of what

19   a reasonable inspection fee is in the

20   industry based upon?

21   A.    Ask me that again.  I probably

22   can't --

23          MR. HALL:  Would you read it

## FREEDOM COURT REPORTING

Page 66

1    back?

2

3              (Record read.)

4

5        A.    No documented knowledge.

6        Q.    (BY MR. HALL:)  What

7    experience do you have with inspection

8    fees in connection with repossessions

9    and sales?

10       A.    None with actual repossession.

11       Q.    Let me ask you this:  In the

12   middle of paragraph 7, there is a

13   sentence that says, the charge of $300

14   is unreasonable and excessive based

15   upon my experience and the standard in

16   the industry.

17       A.    Okay.

18       Q.    What is your experience that

19   you base that statement on?

20       A.    We have to do a DOT inspection

21   of every truck that we lease on to our

22   company.

23       Q.    Who does that inspection?

## FREEDOM COURT REPORTING

Page 72

1       MR. STARNES:  When you move on

2   to something different, let me know,

3   because I need to take a quick break

4   and make a telephone call.  But you can

5   go ahead and finish this inspection

6   stuff, if you want to.

7       MR. HALL:  Go ahead.

8

9       (Short recess.)

10

11      Q.   (BY MR. HALL:)  What is the

12  detailing fee?  I'm looking at

13  paragraph 8.

14      A.   I don't know.  You tell me.

15  I'm just kidding.  Yeah.  What exactly

16  are you asking me there, David?

17      Q.   What all is involved in

18  detailing?

19      A.   When we detail a truck, it's

20  basically a complete cleaning of the

21  inside and outside.

22      Q.   Okay.  Do you know who

23  detailed these Volvo trucks for Volvo?

## FREEDOM COURT REPORTING

Page 73

1      A.    No.

2      Q.    Have you used any outside

3   vendors to detail your tractors?

4      A.    I use an outside service to,

5   you know, wash and clean my trucks,

6   correct.

7      Q.    Does that include cleaning the

8   interior?

9      A.    No.

10     Q.    The outside service that does

11  the washing and cleaning, what do they

12  charge?

13     A.    What, now?

14     Q.    What do they charge?

15     A.    They charge us $50.

16     Q.    What's the name of the

17  company?

18     A.    H & H Truck Wash.

19          MR. STARNES:  Sandy said if he

20  knew you could get 500 bucks a truck,

21  he was going to go into the truck

22  washing business.  Be Guy, Fred and

23  Sandy Truck Detailing.

# FREEDOM COURT REPORTING

Page 74

1    A.    I cleaned up a truck myself

2  Tuesday.

3    Q.    Do you take your trucks to the

4  truck wash to do that?

5    A.    We actually clean our trucks

6  at our shop.    That's just an outside

7  service that we use if the trucks were

8  in that particular area.

9    Q.    Do you know why only eight of

10  the 21 trucks were detailed?

11    A.    No idea.

12    Q.    Do you know what all was

13  involved in the detailing that was done

14  on these eight trucks?

15    A.    No.

16    Q.    You don't?

17    A.    No.

18    Q.    Do you know which eight trucks

19  -- and if you need any documents --

20        MR. STARNES:    It's not shown

21  there.    You would have to look at the

22  reconciliation report --

23        THE WITNESS:    Each truck,

# FREEDOM COURT REPORTING

1                      C E R T I F I C A T E

2

3    STATE OF ALABAMA:

4    JEFFERSON COUNTY:

5

6         I hereby certify that the above and

7    foregoing deposition was taken down by me

8    in stenotype, and the questions and answers

9    thereto were reduced to typewriting under

10   my supervision, and that the foregoing

11   represents a true and correct transcript of

12   the deposition given by said witness upon

13   said hearing.

14        I further certify that I am neither of

15   counsel nor kin to the parties to the

16   action, nor am I in any way interested in

17   the result of said cause.

18

19

20

21

22

23                                  *Melanie Petix*

# EXHIBIT D

# FREEDOM COURT REPORTING

Page 1

1       IN THE UNITED STATES

2       DISTRICT COURT FOR THE

3       MIDDLE DISTRICT OF ALABAMA

4

5                                    **ORIGINAL**

6   CIVIL ACTION NUMBER:  3:06CV638-SRW

7

8   VFS LEASING CO.,

9           Plaintiff,

10  vs.

11  G.F. KELLY, INC., d/b/a KELLY TRUCKING;

12  and GUY KELLY,

13          Defendants.

14

15

16       DEPOSITION TESTIMONY OF

17          CHARLES DAVID LANCE

18

19  April 12, 2007

20  2:35 p.m.

21

22  COURT REPORTER:

23  MELANIE L. PETIX, CSR, CLR

## FREEDOM COURT REPORTING

1    Oh, here it is.

2          MR. STARNES:  There it is

3    right there.  I've got an extra one of

4    those, too, if you want me to give it

5    to him.  It's right here.

6    Q.    (BY MR. HALL:)  Looking at

7    Plaintiff's Exhibit 6, you reviewed

8    each of these, I guess I don't know

9    what to call them other than reports?

10   A.    Estimate of repairs, yes, sir.

11   Q.    Yeah.  So you focused on the

12   second page with the reconditioning?

13   A.    Yes, sir.

14   Q.    Now, there are some

15   handwritten notes out to the side.

16   What does that mean?

17   A.    That was what I figured I

18   could do the work for.

19   Q.    Those are your notes?

20   A.    Yes, sir.

21   Q.    And that's what you figured

22   you could do that work for --

23   A.    Yes, sir.

## FREEDOM COURT REPORTING

Page 23

1    Q.    -- based upon your rates at

2   Kelly Trucking?

3    A.    Yes, sir.

4    Q.    All right.  In 2005?

5    A.    Yes, sir.

6    Q.    So that would be $50 an

7   hour --

8    A.    Yes, sir.

9    Q.    -- and whatever Kelly Trucking

10  could buy the parts for?

11   A.    Yes, sir.

12   Q.    I guess  on the second page of

13  Plaintiff's Exhibit 6, you make

14  reference to the unit number.  Unit

15  number last three digits 013, you are

16  saying that you could clean and detail

17  it for $125?

18   A.    Yes, sir.

19   Q.    Do you know what cleaning and

20  detailing goes for in Atlanta in 2005?

21   A.    No, sir.

22   Q.    Do you know what cleaning and

23  detailing goes for in Birmingham?

## FREEDOM COURT REPORTING

Page 39

1    Q.   What I need for you to do is

2  to tell me what things on the

3  reconditioning were not needed to bring

4  it up to wholesale condition.

5    A.   Well, most of the parts here

6  are body parts, which would be, you

7  know, the hood and the fender.  That

8  one would probably need -- the ashtray,

9  I mean, you see that, that wouldn't

10  need to be done.  At least that's my

11  opinion.

12        MR. STARNES:  That's what this

13  is.  He is just asking your opinion.

14    A.   Well, all the things on

15  here --

16        MR. STARNES:  Go ahead.

17    A.   All the things on here would

18  bring the truck and make the truck more

19  accessible to sell.

20    Q.   Okay.  Just so I'm clear, I

21  want to make sure you and I are on the

22  same page, looking at paragraph 5 of

23  your affidavit, the last sentence says,

# FREEDOM COURT REPORTING

Page 40

1    the repairs shown on these appraisal

2    reports would result in the trucks

3    being in more than wholesale condition,

4    which is not in keeping with the

5    standard.

6              Are those the appraisal

7    reports that you are talking about?

8         A.    Yes, sir.

9         Q.    What is the standard that you

10   are referring to?

11        A.    Explain.

12        Q.    That's what I'm asking you to

13   do.

14        A.    Okay.

15        Q.    You make reference to a

16   standard in paragraph 5.

17        A.    I guess it would be repaired

18   to what we would do it for if we had it

19   at the shop.  I mean, we would bring it

20   in and if it needed, you know, a crack

21   fixed here or a fender fixed there,

22   then we would do that necessary repair

23   to our standards.

# FREEDOM COURT REPORTING

Page 41

1      Q.    To Kelly Trucking standards?

2      A.    Right.

3      Q.    In paragraph 6 you say, I have

4   evaluated the cost of these repairs

5   based upon knowledge and experience,

6   and have determined the actual cost of

7   the same repairs.  Attached is the

8   chart comparing the reconditioning

9   expense contained in the appraisal

10  report with my opinion of the actual

11  cost of these repairs.

12     A.    Yes, sir.

13     Q.    When you say based upon your

14  experience and knowledge, are you

15  talking about what would have been done

16  at Kelly Trucking?

17     A.    Yes, sir.

18     Q.    Do you have any experience in

19  actually buying or selling vehicles at

20  auction?

21     A.    No, sir, not at auction.

22     Q.    Do you have any experience

23  just buying and selling?  When I talk

# FREEDOM COURT REPORTING

1               C E R T I F I C A T E

2

3   STATE OF ALABAMA:

4   JEFFERSON COUNTY:

5

6       I hereby certify that the above and

7   foregoing deposition was taken down by me

8   in stenotype, and the questions and answers

9   thereto were reduced to typewriting under

10  my supervision, and that the foregoing

11  represents a true and correct transcript of

12  the deposition given by said witness upon

13  said hearing.

14      I further certify that I am neither of

15  counsel nor kin to the parties to the

16  action, nor am I in any way interested in

17  the result of said cause.

18

19

20

21

22

23                     *Melanie Betix*

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**